Argued and submitted February 6, University of Oregon, Eugene, affirmed September 27, 2006, petition for review denied February 6, 2007 (342 Or 344)

# TUALATIN VALLEY HOUSING PARTNERS,
## *Appellant,*

*v.*

# TRUCK INSURANCE EXCHANGE,
## *Respondent.*

## 0306-06731; A126232

144 P3d 991

Robert E.L. Bonaparte argued the cause for appellant. With him on the briefs was Shenker & Bonaparte, LLP.

Beth Cupani argued the cause for respondent. With her on the brief were Lisa E. Lear and Bullivant Houser Bailey PC.

Before Landau, Presiding Judge, and Schuman, Judge, and Mitchell, Judge pro tempore.

LANDAU, P. J.

**LANDAU, P. J.**

This is an insurance coverage dispute in which the principal issue is whether defendant insurer is obligated, under an apartment owners policy of insurance that it issued to plaintiff, to pay for damage to plaintiff's apartment building resulting from the manufacture of methamphetamine in one of the apartment units. Defendant maintains that it is not obligated to pay for the damage, because the policy is subject to an exclusion for damage arising out of criminal acts committed by anyone with an interest in the property, including tenants. Plaintiff maintains that the exclusion for criminal acts does not apply, because tenants do not have an "interest" in rented premises and because, in any event, the methamphetamine was produced without the knowledge or cooperation of the actual tenant. The trial court agreed with defendant and entered summary judgment accordingly. We affirm.

The relevant facts are not in dispute. Plaintiff owns the Fircrest Manor Apartments, an apartment building in Beaverton. Plaintiff purchased an apartment owners property insurance policy from defendant. Among other things, the policy obligated defendant to pay "for direct physical loss of or damage to" plaintiff's apartment building, subject to certain exclusions and limitations. Among the exclusions is one for loss or damage caused by or resulting from the following:

> "Dishonest or criminal acts by you, anyone else with an interest in the property, or any of your or their partners, employees, directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:
>
> "(1)   Acting alone or in collusion with others;
>
> "(2)   Whether or not occurring during the hours of employment.
>
> "This exclusion does not apply to acts of destruction by your employees; but theft by employees is not covered."

Plaintiff rented one of its Fircrest Manor apartments to Brigette Burney and two minors. In June 2002, police officers investigating a robbery discovered a "clandestine methamphetamine laboratory" in the utility room of Burney's apartment. According to the police report, at the time of the discovery of the lab, Burney was in the apartment with a man by the name of Martin Arthur. Burney told the officers that she was unaware of the drug activities taking place in her apartment. Arthur told the officers that the lab belonged to him. Both Burney and Arthur were arrested and charged with manufacturing a controlled substance within 1,000 feet of a school. *See* ORS 475.888. Burney later pleaded no contest to the charges and was convicted.

Following the discovery of the lab in Burney's apartment, plaintiff sent to her a termination notice explaining that her rental agreement was being terminated because she had been "caught manufacturing illegal substances in [her] unit." When Burney did not quit the premises, plaintiff filed an action in justice court for forcible entry and detainer against Burney, presenting the termination notice letter in support of its complaint. The justice court issued an order of restitution in plaintiff's favor.

In September 2002, plaintiff filed a claim under its apartment owners policy for the damage to Burney's unit caused by the manufacture of methamphetamine. Defendant denied the claim. Plaintiff then initiated this action against defendant for, among other things, breach of contract. Plaintiff alleged that it had suffered $225,000 in damage to the apartment, which defendant refused to cover. Defendant answered and, among other things, alleged the applicability of the criminal acts exclusion as an affirmative defense.

Defendant moved for summary judgment on the breach of contract claim on the ground that any damage or loss resulting from the methamphetamine lab in Burney's apartment was subject to the exclusion for criminal acts committed by persons with an interest in the property. Plaintiff opposed the motion on the ground that tenants are, as a matter of law, not persons with an "interest" in a rented apartment. According to plaintiff, persons with an "interest" in the property are limited to those with an *ownership* interest in

the premises. In the alternative, plaintiff argued that, even if the exclusion applies to apartment tenants, there remains a genuine issue of material fact in this case about whether the damage to the unit was caused by the tenant, Burney, as opposed to another person, Arthur.

The trial court granted defendant's motion. Plaintiff asked for clarification of the court's ruling with respect to its argument about the degree to which Burney actually caused the damage to the apartment. The trial court responded that the damage was caused by the operation of the lab, in which Burney participated. According to the trial court, under the terms of the policy, the particular degree of her participation is immaterial.

On appeal, plaintiff argues that the trial court erred in granting defendant's motion for summary judgment. In plaintiff's view, the court erred both in concluding that, as a matter of law, the criminal acts exclusion applies to apartment tenants and in neglecting to find that there remains a genuine issue of material fact concerning the degree of the tenant's involvement in the criminal acts. We address each of those arguments in turn.

In reviewing a trial court's decision to grant summary judgment, we view the facts in the light most favorable to the nonmoving party to determine whether there are genuine issues of material fact and whether the moving party was entitled to judgment as a matter of law. ORCP 47 C. In this case, plaintiff's first argument is that, even assuming that the damage was caused by the actions of a tenant, the criminal acts exclusion does not apply as a matter of law. That argument is one of contract interpretation—specifically insurance policy interpretation—which we review as a matter of law in light of the interpretive principles set out in *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 469-70, 836 P2d 703 (1992).

Under *Hoffman*, our objective is to ascertain the intention of the parties "based on the terms and conditions of the insurance policy." *Id.* at 469. We begin with the wording of the policy, applying any definitions that are supplied by the policy itself and otherwise presuming that words have their plain, ordinary meanings. *Id.* at 469-70. If, from that

vantage point, we find only one plausible interpretation of the disputed terms, our analysis goes no further. *Id.* If we find that the disputed terms are susceptible to more than one plausible interpretation, however, we examine those terms in the broader context of the policy as a whole. *Hoffman*, 313 Or at 470. If our consideration of the policy's broader context fails to resolve the ambiguity, then we will construe the policy against the drafter, in this case, defendant. *Id.* at 470-71. In all events, interpretation of an insurance policy is a question of law that is confined to the four corners of the policy without regard to extrinsic evidence. *Andres v. American Standard Ins. Co.*, 205 Or App 419, 424, 134 P3d 1061 (2006).

The exclusion at issue in this case applies to dishonest or criminal acts by "you," that is the policyholder, "anyone else with an interest in the property, or any of your or their partners, employees, directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose." The exclusion applies whether the person acts "alone or in collusion with others."

The policy does not define the term "interest." In ordinary parlance, an "interest" refers to a "right, title, or legal share in something" or "something in which one has a share of ownership or control." *Webster's Third New Int'l Dictionary* 1178 (unabridged ed 2002). Similarly, *Black's Law Dictionary* 729 (5th ed 1979) defines "interest" as "[t]he most general term that can be employed to denote a right, claim, title, or legal share in something." As the term is ordinarily used, therefore, an "interest" is inherently broad, denoting not merely an ownership relationship but any legal share or right of control.

A "tenant," by definition, ordinarily refers to one who enjoys a legal right of occupancy. *Webster's* defines it as "one who holds or possesses real estate * * * by any kind of right (as in fee simple, in common, in severalty, for life, for years, or at will)." *Id.* at 2354. *Black's* defines it as "one who holds or possesses land or tenements by any kind of right or title, whether in fee, for life, for years, at will, or otherwise." *Id.* at 1314. In turn, *Black's* defines a "tenancy" as "an *interest*

*in realty* which passes to the tenant, and a possession exclusive even to that of landlord, except as lease permits landlord's entry." *Id.* at 1313 (emphasis added). Relevant statutes similarly employ the term in its ordinary sense, defining "tenant" as a person "entitled under a rental agreement to occupy a dwelling unit to the exclusion of others." ORS 90.100(41). At common law, tenants likewise are routinely referred to as having an "interest" in the property that they have the right to occupy. *See, e.g.*, *Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 353, 876 P2d 761 (1994) (addressing validity of restraint on alienation "without the consent of the landlord of the tenant's interest in the leased property"); *Goodman v. Micka*, 151 Or App 27, 29, 949 P2d 1222 (1997), *rev den*, 326 Or 389 (1998) (referring to a claim of a "tenancy interest in the property"); *Taggart v. Battaglia*, 140 Or App 585, 590, 915 P2d 1001 (1996) (addressing issues arising when "a tenant terminates his interest in property").

The ordinary meaning of the word "interest," therefore, would appear to support defendant's and the trial court's reading of the exclusion to apply to tenants, and not just to persons with an *ownership* interest in the premises. That meaning is borne out by its use in the exclusion itself. The exclusion is phrased quite broadly, referring to "*anyone* with *an* interest in the property" and "*anyone*" entrusted with the property for "*any* purpose." (Emphasis added.) *See, e.g.*, *Oregon State Denturist Assn v. Board of Dentistry*, 172 Or App 693, 702, 19 P3d 986 (2001) (use of the article "any" in a statutory definition indicated legislature's intent that definition be "broadly inclusive"); *Totten v. New York Life Ins. Co.*, 298 Or 765, 771, 696 P2d 1082 (1985) (use of the term "any aircraft" as opposed to simply "aircraft" was intended to give an insurance policy's exclusion clause a broad meaning); *Argonaut Insurance Co. v. Ketchen*, 243 Or 376, 413 P2d 613 (1966) (holding that the phrase "any employee" in an exclusion clause was intended to "enlarge the scope of the phrase" and to "preclude[ ] limiting the application of the phrase to a particular kind of employee"). Moreover, there is nothing in the balance of the exclusion—or, for that matter, the balance of the policy as a whole—that communicates an intention to narrow the broad reach that the phrasing of the exclusion suggests.

Plaintiff insists that the inclusion of more specific terms—"partners, employees, directors, trustees, [or] authorized representatives"—suggests that the more general reference to an "interest" in the premises must have a more limited meaning. According to plaintiff, because all of the specifically listed persons are property owners or agents of property owners, it is "manifest" that the exclusion was intended to apply only to such property owners or agents of property owners. In that regard, plaintiff invokes what it characterizes as "fundamental principles we use every day in basic acts of language comprehension," such as the maxim of construction *ejusdem generis*.

We are unpersuaded for two reasons. First, *ejusdem generis* has no application to this particular interpretive problem. To begin with, that maxim—far from reflecting a "fundamental principle" of everyday communication—is of debatable validity as an accurate reflection of intended meaning. *See, e.g.*, F. Reed Dickerson, *The Interpretation and Application of Statutes* 249 (1975) (*ejusdem generis* and similar canons are "convenient fictions for deciding specific controversies * * * [that] should not be confused with what they caricature, measures of actual meaning"). Accordingly, it always should be applied with caution. *State v. Mayorga*, 186 Or App 175, 182, 62 P3d 818 (2003) ("Caution is warranted when applying the rule, both because of its uncertain justification and because of its malleability.").

Aside from that, it applies only when a provision refers to a list of specific items followed by an open-ended "catch-all" phrase such as "and other such items." *Vannatta v. Keisling*, 324 Or 514, 533, 931 P2d 770 (1997) (specific list followed by "other improper conduct"); *State v. Moore*, 174 Or App 94, 99, 25 P3d 398 (2001) (principle applies when specific list is followed by an "open-ended 'catch-all' term"). It also does not apply when its application would lead to redundancy or to a construction that otherwise is at odds with the parties' apparent intentions. *See, e.g.*, *Sanders v. Oregon Pacific States Ins. Co.*, 110 Or App 179, 183, 821 P2d 1119 (1991), *aff'd*, 314 Or 521, 840 P2d 87 (1992) (rejecting application of *ejusdem generis* when it would result in creation of surplusage).

In this case, the disputed exclusion is not phrased with the typical list of specifics followed by an open-ended catch-all phrase. Moreover, plaintiff's application of the rule would lead to unnecessary redundancy. If the scope of the exclusion is limited to only owners or agents of owners, then the reference to *"anyone else* with an interest in the property" loses meaning and becomes surplusage.

Second, plaintiff's reasoning proceeds from a false premise as to the phrasing of the exclusion. Plaintiff argues that the reference to "anyone else with an interest in the property" must be taken to mean either an owner or an agent of the owner because all other persons listed in the exclusion are either the owner or the owner's "partners, employees, directors, trustees, [or] authorized representatives." The problem is that the exclusion does not actually say that. The reference to "partners, employees, directors, trustees, [or] authorized representatives" is not limited to such persons in relation to owners alone. To the contrary, the exclusion states that it applies to dishonest or criminal acts by "you [that is, the owner], anyone else with an interest in the property, or any of your *or their* partners, employees, directors, trustees, [or] authorized representatives." Thus, it plainly applies not only to dishonest or criminal acts of the owner or the agents of the owners, but also to dishonest or criminal acts of "anyone else with an interest in the property" and *their* agents.

Plaintiff also argues that certain internal memoranda from defendant show that defendant itself does not interpret the exclusion to apply to tenants. Even assuming for the sake of argument that those memoranda support that proposition, the fact remains that "the court has been clear since *Hoffman Construction Co.* that the interpretation of insurance policies is a question of law, not one that is resolved by evidence extrinsic to the policy itself." *Andres*, 205 Or App at 424.

■ We turn, then, to plaintiff's alternative argument that, even if the exclusion applies to damage caused by the dishonest or criminal acts of tenants, there remains a genuine issue of material fact about whether the damage in this case was caused by Burney, the tenant. Plaintiff argues that the evidence showed that Burney told the police that she was

unaware of the methamphetamine lab in her apartment and that that evidence at least creates a triable issue about whether she participated in its operation.

The problem with that argument is that it relies on an assertion of fact that is directly contrary to the assertion of fact that was the basis for plaintiff's action for forcible entry and detainer. Plaintiff sought—and obtained—a court order evicting Burney from the premises based expressly on plaintiff's allegation that she had been "caught manufacturing illegal substances in [her] unit." Under the circumstances, plaintiff is estopped from taking a different position in this action.

■ The doctrine of judicial estoppel provides that a party to one judicial proceeding may not assert a position that is inconsistent with a position that the same party successfully asserted in an earlier judicial proceeding. *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 609-10, 892 P2d 683 (1995). The doctrine is not applicable unless the party asserts a position "clearly contradictory" to the one that it asserted in the earlier proceeding. *McAmis Industries v. M. Cutter Co.*, 161 Or App 631, 642-43, 984 P2d 909, *rev den*, 329 Or 553 (1999).

Plaintiff does not appear to contest the applicability of the doctrine of judicial estoppel. Instead, plaintiff contests its effect in this case. According to plaintiff, "[e]ven assuming *arguendo* that estoppel applied, there is no evidence in the record to show that Burney's purported participation caused the damage to the insured premises."

The problem with that argument is that, as the trial court correctly observed, under the unambiguous terms of the exclusion, it does not matter whether there is proof that the tenant actually caused the damage to the premises. The exclusion applies to damage or loss caused by the tenant "[a]cting alone *or in collusion with others*." (Emphasis added.) The exclusion thus applies both to damage caused by Burney acting alone and to damage resulting from the combined criminal efforts of Burney and Arthur. In this case, it is undisputed that the damage to the premises was a result of the criminal enterprise of manufacturing methamphetamine

in Burney's apartment. Burney participated in that enterprise with Arthur. It necessarily follows that the damage falls within the scope of the criminal acts exclusion.

For all the foregoing reasons, the trial court did not err in granting defendant's motion for summary judgment.

Affirmed.